**In re In the Interest of J.C.**

**Appeal of J.C.**

Superior Court of Pennsylvania.

Argued April 5, 2000.

Filed May 2, 2000.

Robert M. Rosenblum, Stroudsburg, for appellant.

Joseph Kameen, Asst. Dist. Atty., Milford, for Com., appellee.

Before McEWEN, President Judge, and JOYCE and TAMILIA, JJ.

TAMILIA, J.:

¶ 1 This case presents one of the most serious, perplexing and accelerating forms of youthful conduct which society has faced in recent times. What was once the occasional bomb threat, telephoned to the principal's office to trigger a shut down of a school to obtain a day off or to avoid a test, has escalated to planned coordinated threats which no longer can be handled summarily, and in every instance, as a result of tragic occurrences throughout the country, must be treated by schools, police and emergency services as potentially serious. Whether the threat is real or fraudulent, the result is devastating to society and the social fabric of the entire community. This case illustrates the difficulty in balancing the non-lethal fraud perpetrated and the disproportionate disarray that results, requiring a definitive response from the court to balance the needs of the child with the protection of society.

¶ 2 J.C., a minor, appeals the August 12, 1999 Order of disposition following an adjudication of delinquency. Upon review of the evidence, the court found appellant committed the delinquent act of making terroristic threats.[1] Appellant was ordered to pay a $500 fine and placed at a Northern Tier Youth Services residential treatment facility subject to administrative review after six months and judicial review after nine months.

¶ 3 On April 23, 1999, appellant placed threatening hand-written notes and two packages purporting to contain bombs in the Delaware Valley Middle and High Schools.[2] As the trial court explained in its Opinion, the discovery of these items "led to the evacuation of the school buildings, the disruption of school, the emergency response of numerous public protective personnel, and the fear and anxiety of hundreds." (Trial Court Opinion, Thomson, P.J., December 17, 1999, at 1). Appellant presents the following challenges on appeal.

1. Where the Commonwealth's witnesses placed the appellant in three different physical locations at approximately the same time, and the handwriting on the notes was not identified, was the evidence presented below sufficient to sustain the

1. This offense, if committed by an adult, would constitute the crime of terroristic threats, 18 Pa.C.S.A. § 2706, a first degree misdemeanor carrying a maximum penalty of five years' incarceration.

2. This incident came just 3 days after the highly publicized April 20, 1999 tragedy in Littleton, Colorado, in which two students opened fire in the Columbine High School, killing twelve classmates and one teacher.

Commonwealth's case beyond a reasonable doubt?

2. Whether the court committed a gross abuse of discretion in the disposition of the juvenile, and whether such disposition constitutes cruel and unusual punishment?

(Appellant's brief at 4.)

In evaluating a challenge to the sufficiency of the evidence, we must determine whether, viewing the evidence in the light most favorable to the Commonwealth as verdict winner, together with all reasonable inferences therefrom, the trier of fact could have found that each and every element of the crimes charged was established beyond a reasonable doubt. In making this determination, we must evaluate the entire trial record and consider all the evidence actually received. It is within the province of the fact finder to determine the weight to be accorded each witness's testimony and to believe all, part, or none of the evidence introduced at trial.

*In the Interest of B.R.*, 732 A.2d 633, 636 (Pa.Super.1999) (internal quotations and citations omitted).

¶ 4 Appellant argues the testimony was inconsistent with respect to where she was at the relevant times during the April 23, 1999 school day.

¶ 5 Several students testified regarding their interaction with appellant that day. Jennifer Ricca and Angelique Weissang testified that appellant approached both of them in a bathroom, admitted to being the source of the threats and pointed out one of the packages she had placed in a girl's bathroom. Amy Rawcliffe also testified appellant admitted to her that she was responsible for the bomb scare. When Rawcliffe expressed doubt as to appellant's admission, appellant pointed to a place in a bathroom ceiling where the tile was disturbed and indicated there was a bomb there. Appellant made two additional admissions that she caused the bomb scare; one to a student in the hall prior to the building evacuation and the other to a student near the school bus during the evacuation. Early the following week, appellant yet again was heard admitting that she caused the bomb scare.

¶ 6 The evidence presented by school officials established that appellant was not where she was supposed to be at the relevant times. Furthermore, despite slight variations in the testimony, the witnesses testified credibly with respect to appellant's statements and their observations. It is clear that appellant not only wrote the threatening notes and left the packages, but went a long way toward incriminating herself by telling other students what she had done. The trial court characterized the evidence as overwhelming, finding it satisfied the requirement of beyond a reasonable doubt. Our careful review of the record compels us to agree.

¶ 7 Appellant contends the prosecution should have introduced handwriting comparisons to prove she authored the threatening notes. We disagree. In the present case, the overwhelming evidence establishes that appellant wrote the notes and, therefore, handwriting analysis was unnecessary. Appellant repeatedly admitted to the witnesses she had written the notes and the notes themselves communicate appellant's threats of violence.

A person is guilty of terroristic threats ... if he or she threatens to commit any crime of violence with intent to terrorize another or to cause evacuation of a building, place of assembly, or facility of public transportation, or otherwise to cause serious public inconvenience, or in reckless disregard of the risk of causing such terror or inconvenience.

. . .

Neither the ability to carry out the threat nor a belief by the persons threatened that it will be carried out is an essential element of the crime. Rather, the harm sought to be prevent-

ed by the statute is the psychological distress that follows from an invasion of another's sense of personal security.

*In the Interest of B.R., supra* (internal quotations and citations omitted). Accordingly, appellant's sufficiency of the evidence challenge fails.

■ ¶ 8 Next, appellant claims the trial court improperly focused on punishment rather than rehabilitation in its disposition and that her placement in a residential treatment facility for an indeterminate period of time is unreasonable in light of her age, lack of prior juvenile record and her rehabilitative needs. Appellant argues that in arriving at its findings, the court placed too much weight on the testimony of Pike County Probation Officer Brian Steuhl. The record indicates and we also find that the opposite is true. The treatment proposed by the Tiogo Detention Center, in its diagnostic evaluation, was flawed because the Center had not obtained the complete background relating to J.C.'s home life, mental state and overall adjustment. In particular, this is relevant because throughout the evaluation process, J.C. and her parents were in denial and provided false responses to critical inquiries. Treatment, to be effective, requires relinquishment of denial, dealing with the child's underlying problems and incorporating change in the significant persons and environmental conditions associated with the child. Based on the inadequate foundation for the recommendation of Tiogo Detention Center, the court appropriately relied on the more thorough and viable treatment plan suggested by the probation officer. The Vision Quest program offers only a superficial behavior modification regime of short duration whereas the Northern Tier Residential Treatment Center offers a full array of mental health, family and social therapy and counseling, coupled with a concurrent educational program. Vision Quest responds only to the need "to do something", whereas Northern Tier addresses the underlying problem. In this "new age" era

of violence and terrorism perpetrated by children and young adults, the closest scrutiny of the events and the milieu fostering the offender's radical behavior must be conducted by responsible officials, particularly the court, to assure the source of the irrational behavior is treated. Boot camps, as an alternative to traditional incarceration, cannot be the treatment indicated when there are multiple interrelated psycho-social and environmental problems. While the reaction and perception of danger in this case far exceeded the actual physical harm that could have resulted, the alarm and psychological disturbances to the school, the community and the undermining of public confidence and perception of security in one of the most fundamental institutions of our society, requires a vigorous and effective response. Only then can the child be successfully treated and the community reassured of the safety of its schools.

■ ¶ 9 A delinquent's disposition is within the sound discretion of the trial court and will not be disturbed by this Court absent an abuse of discretion. *See In re Love*, 435 Pa.Super. 555, 646 A.2d 1233 (1994), *appeal denied*, 540 Pa. 579, 655 A.2d 511 (1995). The purpose of the Juvenile Act, 42 Pa.C.S.A. § 6301(b)(2), is as follows:

(2) Consistent with the protection of the public interest, to provide for children committing delinquent acts programs of supervision, care and rehabilitation which provide **balanced attention** to the protection of the community, the imposition of accountability for offenses committed and the development of competencies to enable children to become responsible and productive members of the community.

(Emphasis added). This section evidences the Legislature's clear intent to protect the community while rehabilitating and reforming juvenile delinquents.

¶ 10 From this case on its facts and legal findings, in conjunction with the stated purpose of the Juvenile Act, we can eluci-

date a short list of guidelines to the trial courts and probation offices dealing with these cases.

1) The facts should establish a purposeful and intentional perpetration of actual or feigned acts which, if carried out, would cause injury, disarray and/or psychological disturbance to the persons in the area encompassed by the threats or activity.

2) Each individual, when apprehended, should be quickly but thoroughly evaluated by responsible police investigators, mental health professionals and juvenile correctional experts to determine the appropriate cause of action, determine its potential for success, and evaluate any previous deviance, violent behavior, suicidal thoughts or tendencies and potential for future similar behavior.

3) The child's family relationships, stability, deviance, interaction with other children, peers and associates, must be evaluated in terms of their impact on the child's conduct and behavior.

4) A thorough and accurate compilation of the actual or derivative effect of the behavior on other individuals, the school and community and the security and social service resources of the community must be assessed prior to ultimate disposition of the case.

¶ 11 We believe the esteemed trial judge, President Judge Harold A. Thomson, Jr., fulfilled all of these considerations in his disposition of this case. Upon review of the disposition transcript, it is clear the court balanced many factors in fashioning a disposition appropriate for appellant. In addition to the testimony of Officer Steuhl, the court reviewed the social summary report prepared after evaluation of appellant, appellant's rehabilitative needs and consideration of the seriousness of appellant's acts. The record indicates that neither appellant nor her parents appreciated the severity of her actions. Moreover, the record reveals appellant has a history of suicidal thoughts and that the residential treatment facility is better equipped to address appellant's problems than alternative placements, such as boot camp. Based upon our review, it is clear the court did not abuse its discretion.

¶ 12 The range and variety of these incidents is incapable of description, but with the above guidelines it should be possible to construct a treatment program ranging from home supervision, or counseling, through residential therapeutic treatment, incarceration or certification to criminal court. The juvenile court, with its expertise, resources and commitment to both rehabilitation of children and protection of the public, is uniquely capable of dealing with this crisis and, to some degree, preventing its escalation.

¶ 13 Order of disposition affirmed.

¶ 14 McEWEN, President Judge, concurs in the result.